UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WINTHROP STEELE SMITH, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:09-0250 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| SERVICEMASTER and ) | |
| TRUGREEN LIMITED PARTNERSHIP, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Pending before the court is a Motion to Dismiss or, Alternatively, to Stay Action and Compel Arbitration (Docket No. 7) filed by defendants ServiceMaster and TruGreen Limited Partnership ("TruGreen") to which the plaintiff has responded (Docket No. 9), the defendants have replied (Docket No. 13), and the plaintiff has filed a surreply (Docket No. 17). For the reasons discussed herein, this motion will be denied.

### FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Winthrop Smith, is a resident of Murfreesboro, Tennessee, and is a former employee of defendant TruGreen.[1] TruGreen is a nationwide lawn and landscape provider offering services in weed control, fertilization and pest control. Defendant ServiceMaster is TruGreen's parent company.[2]

---

[1] Unless otherwise noted, the relevant facts are drawn from the Complaint (Docket No. 1).

[2] The defendants contend that "TruGreen is a business unit and subsidiary of The ServiceMaster Company [and] Mr. Smith was an employee of TruGreen, and TruGreen, not ServiceMaster, employed ... Mr. Smith. Thus, ServiceMaster is not a proper party to this

1

The plaintiff began his employment with TruGreen on or about January 15, 2007 as a sales representative working out of TruGreen's Murfreesboro office. The plaintiff had success at TruGreen, earning multiple certificates of recognition as a "top sales performer." On or about August 28, 2008, the plaintiff's wife underwent a complete hysterectomy. The procedure had severe complications, including a "visceral rupture" on or about November 15, 2008.

Around this time, the plaintiff began using his accrued vacation and sick leave time to tend to his wife. However, due to the ongoing nature of his wife's health problems, on or about November 24, 2008, the plaintiff requested intermittent Family and Medical Leave Act (FMLA) leave, a request that was approved by a qualified doctor, with the leave approved through January 12, 2009.

During this approved leave period, from time to time, the plaintiff took hours or full days off from work to transport his wife to medical appointments and to attend to her physical needs, as she was unable to care for herself. The plaintiff estimates that he took less than fifteen days off from work in order to care for his wife during his approved FMLA leave. Around Christmas, the plaintiff had conversations with his supervisor, Walt McDaniel, and his branch manager, Matt Crowley, regarding his leave and whether the plaintiff really wanted to remain at TruGreen. In both conversations, the plaintiff reaffirmed that he wanted to remain at TruGreen for the long term, but that, because of his wife's health, he would need an extension of his FMLA leave further into 2009.

Around this time, the defendants were implementing their "We Listen" program, which is

---

lawsuit." (Docket No. 8 at 1.) ServiceMaster has put forth no additional evidence or authority for the proposition that it should be dismissed as an improper party, and, therefore, other than the defendants' assertion, there is no basis to dismiss ServiceMaster on this ground at this time.

their new employee dispute resolution program. (Docket No. 8 at 3.) The relevant terms of "We Listen" are contained in a brochure that was apparently sent out company-wide and that has been provided to the court.

According to the brochure, "We Listen" is a program designed to direct common workplace disputes into alternative dispute resolution and away from the court system. (Docket No. 8 Ex. 1 at 7.) The program covers "concerns and allegations related to discrimination or harassment on the basis of race, color, gender, religion, national origin, age, disability, veteran status, sexual orientation, *protected leave status*, or any other legally protected characteristic." (*Id.*) (emphasis added).

"We Listen" contains five escalating "steps" of alternative dispute resolution. (*Id,*) In the first three steps, the company and the employee attempt to resolve the dispute internally. (*Id.*) The first step involves an attempt by the employee to resolve the issue "with local management and/or [a] Human Resources representative." (*Id.*) If the first step does not resolve the issue to the employee's satisfaction, the employee proceeds to the second step, in which he submits his complaint to a telephone hotline for review and investigation by a ServiceMaster ombudsman. (*Id.*) If not satisfied by the investigation and findings of the ombudsman, the employee proceeds to step three, in which he submits his complaint to a senior management board, which investigates the complaint and issues a recommendation. (*Id.*)

If these internal steps are not effective in resolving the dispute, the parties move to the fourth step, in which they submit the dispute to mediation before a mediator acceptable to both sides. (*Id.*) At this stage, the "We Listen" program requires that the employee pay a $50 mediation fee, but, otherwise, ServiceMaster pays all costs associated with "We Listen," except

for the costs of any counsel that the employee chooses to retain.  (*Id*. at 20.)  If mediation fails to resolve the matter, the parties move to the final step, which is binding arbitration, in which a mutually-agreed upon arbitrator resolves the dispute by making a final determination.  (*Id.* at 7.)  The arbitrator is permitted to make any award authorized by law.  (*Id.* at 20.)

For covered claims, "We Listen" is not intended to be optional.  That is, the "We Listen" program brochure states that "an associate who accepts or continues employment at ServiceMaster (by accepting compensation for employment) agrees to resolve all employment-related legal claims against ServiceMaster or any other ServiceMaster entity, associate, manager or joint employer through this process rather than through other avenues." (*Id.* at 13.)  The brochure continues, "ServiceMaster has adopted this five-step program as the exclusive means of resolving workplace disputes.  In adopting the program, ServiceMaster agrees to use the program to resolve all covered workplace disputes."[3]  (*Id*.)  The brochure further states that, if a covered employee attempts to sue on a covered claim, "ServiceMaster attorneys can go before the agency or judge, tell them about ServiceMaster's We Listen program, and ask that the case be stayed or dismissed and brought through the We Listen process."  (*Id.* at 19.)

As noted above, the "We Listen" program was "rolled out" during the same time period that the plaintiff was occasionally missing work to take care of his wife.  Indeed, ServiceMaster states that the program was effective as of January 1, 2009. (*Id.* at 4.)  Further, Matt Crowley (the plaintiff's branch manager) submitted an affidavit in which he states that, "on December 5, 2008, [his] Branch held an informational meeting, wherein the Branch employees were informed

---

[3]That said, in the brochure, ServiceMaster reserves the right to make changes to the program and states that it will provide notice "to the extent possible ... of any material changes to associates as required and/or necessary."  (*Id.* at 8.)

4

of the "We Listen" Program." (Docket No. 14.)

Servicemaster's Director of Communications, Susanna Weston, also submitted an affidavit in which she states that, on January 7, 8, and 9, 2009, ServiceMaster mailed the "We Listen" brochure (discussed above) to the home address of all associates and managers of all ServiceMaster business units, including the home of the plaintiff. (Docket No. 8 Ex. 1 at 1.) Weston states that "the letter sent to Mr. Smith's home enclosing the Program was not returned," which presumably is meant to indicate that the "We Listen" materials mailed to the plaintiff were not returned to ServiceMaster by the U.S. Postal Service. (*Id.*)

In a sworn affidavit, the plaintiff denies that he ever received a copy of the "We Listen" brochure in the mail. (Docket No. 9 Ex. 1 at 2.) In fact, he asserts that, "during the course of my employment with TruGreen, I was never informed of the 'We Listen' program or any other arbitration or alternative dispute resolution program." (*Id.*) The plaintiff points out that, while he was employed, new policies and policy changes were announced, not by mail, but during meetings and conference calls, often with the requirement that the employee sign a statement acknowledging the new policy. (*Id.* at 1.) Further, the plaintiff states that many such policies were posted in the office break room. (*Id.*) The plaintiff contends that there were no meetings, conference calls, or break room announcements about the "We Listen" program to which he was exposed. (*Id.* at 2.)

On January 26, 2009, the plaintiff was informed that his employment was terminated, supposedly because the plaintiff had a side business that was in conflict with TruGreen. The plaintiff claims that he was terminated in retaliation for exercising his rights under the FMLA. On March 13, 2009, the plaintiff filed his Complaint in this case, seeking recovery under the

5

FMLA. There is no dispute that the plaintiff never attempted to invoke the "We Listen" program to resolve his "protected leave status" dispute. Indeed, the plaintiff contends that he had never seen the "We Listen" program brochure until the defendants filed their motion in this case. (Docket No. 9 Ex. 1 at 3.) On April 7, 2009, the defendants moved to dismiss, or, alternatively, to stay this action and to compel arbitration, arguing that the plaintiff's continued employment with TruGreen following the implementation of the "We Listen" program constituted his assent to the terms of that program. The plaintiff has responded that, "because there is no valid agreement to arbitrate, this court should deny defendants' motion and allow this matter to proceed." (Docket No. 9 at 1.)

## ANALYSIS

The defendants have moved to dismiss, or alternatively, to stay this action and to compel arbitration because, the defendants argue, the plaintiff is bound by a unilateral contract he has with the defendants to submit his FMLA claim to the defendants' "We Listen" program. The plaintiff argues that he never heard of the "We Listen" program during the course of his employment (indeed, that he had never seen the "We Listen" brochure prior to the defendants' filing of their motion here) and, therefore, he could not have assented to the terms of the program. (Docket No. 9 Ex. 1.)

**I.    The Purported Arbitration Agreement**

    **A.    The Relevant Framework and Analysis Standard**

The Federal Arbitration Act (FAA) provides that a written provision in a contract "to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

6

revocation of any contract." 9 U.S.C. § 2. This section of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (internal citation and quotation omitted).

When presented with an issue that is referable to arbitration pursuant to a valid arbitration agreement, the court, upon the application of either party, must stay the suit and compel arbitration. 9 U.S.C. § 3; 9 U.S.C. § 4. Here, the defendants argue that the plaintiff's FMLA claim should be stayed and arbitration compelled because the "We Listen" program requires that the plaintiff follow a five-step program to resolve the dispute, with the final step involving binding arbitration.[4] The plaintiff has asked this court to deny the defendants' motion and to allow this case to move forward. (Docket No. 9 at 1.)

As interpreted by the Sixth Circuit, Section 4 of the FAA dictates that a party's motion to enforce an arbitration agreement is to be treated similarly to a motion for summary judgment; that is, the court may grant the motion only if the party opposing the motion cannot raise a "genuine issue of material fact as to the validity of the agreement to arbitrate." *Mazera v. Varsity Ford Management Servs.*, 2009 WL 1375887, *3 (6th Cir. May 19, 2009)(citing 9 U.S.C § 4). If this fact issue is raised, however, the dispute over the validity of the agreement is to be resolved by means of a trial. 9 U.S.C. § 4.("if the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the

---

[4]The defendants argue that, under certain circumstances, it is appropriate for the court, once it determines that an action should be stayed pursuant to the FAA, to not just stay the case, but to dismiss the case all together. (Docket No. 8 at 13.) As discussed herein, because it is not appropriate to stay this action, it is not necessary to reach this issue of dismissal.

7

party alleged to be in default ... the court shall hear and determine such issue."); *see also Green Earth Companies v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002)("if the validity of the agreement to arbitrate is 'in issue,' the court must proceed to a trial to resolve the question.")

Therefore, at this stage, the court merely determines whether the plaintiff has raised a "genuine issue of material fact as to the validity of the agreement to arbitrate," using an analysis standard that mirrors the summary judgment analysis standard; that is, the court will view all facts and inferences drawn therefrom in the light most favorable to the non-moving party and will determine whether the evidence presented is such that a reasonable finder of fact could conclude that no valid agreement to arbitrate exists. *Green Earth*, 288 F.3d at 889. As will be clear from the discussion below, the plaintiff has easily established this genuine issue.[5]

### B. Whether the Plaintiff Has Raised a Fact Issue

While the courts must respect "the liberal federal policy favoring arbitration agreements ... arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Seawright*, 507 F.3d at 972 (internal citation and quotation omitted). Because arbitration agreements are fundamentally contracts, the enforceability of a purported agreement to arbitrate is evaluated according to the applicable state law of contract formation, which here, as the parties agree, is Tennessee. *Id*

In Tennessee (consistent with basic tenets of contract law), a contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon sufficient

---

[5] The parties are scheduled to have an initial case management conference with the court on June 15, 2009, at which time the court will discuss with the parties how they wish to proceed in light of this opinion.

8

consideration, free from fraud or undue influence, not against public policy andسufficiently definite to be enforced." *Doe v. HCA Health Servs. Of Tenn, Inc.*, 46 S.W. 3d 191, 196 (Tenn. 2001) (internal citation and quotation omitted). As the defendants point out,"Tennessee law recognizes the creation of unilateral contracts, where acceptance is indicated by actions under the terms of the contract." (Docket No. 8 at 9 citing *Fisher v. GE Med. Sys*, 276 F. Supp. 2d 891, 895 (M.D. Tenn. 2003)).

Here, as should be clear from the factual discussion above, the primary source of dispute is whether there was mutual assent to the terms of the "We Listen" program as described in the brochure that the defendants claim that they sent to the plaintiff in early January 2009. The defendants contend that the plaintiff "assented to ServiceMaster's 'We Listen' Program by continuing his employment with TruGreen after he received" the early January 2009 mailing. (Docket No. 8 at 11.)

In arguing that the plaintiff assented to the terms of the "We Listen" program, the defendants rely heavily on the *Fisher* and *Seawright* cases, in which, respectively, this court and the Sixth Circuit found that the employee had assented to the terms of his employer's alternative dispute program, even though there was no signed writing in which the employee explicitly consented to the terms of the relevant program. (Docket No. 8 at 9.) In both *Fisher* and *Seawright*, the terms or details of the program were provided and/or mailed to the plaintiff employee by the defendant company, and the program terms stated that continued acceptance of a paycheck was assent to the terms of the program, including the alternative dispute resolution provisions. *Fisher*, 276 F. Supp. 2d at 892; *Seawright*, 507 F.3d at 971.

Both *Fisher* and *Seawright*, however, are distinguishable on the assent issue. In *Fisher*,

9

this court noted that, although the plaintiff did not recall receiving a copy of the program materials, the plaintiff submitted an affidavit in which he stated that he had discussed the program with other individuals at his workplace and that "he was aware of the nature of the program, since he was concerned about the arbitration that it might involve." *Fisher*, 276 F. Supp. 2d at 895. This court concluded, *"in light of his awareness of the existence and nature* of [the program], therefore, [the plaintiff's] continued employment [with the defendant] constitutes sufficient acceptance of the agreement as to make it a valid contract." *Id.* (emphasis added).

In *Seawright*, six years prior to the plaintiff's termination by the defendant employer, the defendant instituted a new employee dispute resolution procedure, which was introduced through a series of informational meetings, announcements, and mailings. *Seawright*, 507 F.3d at 970. At the time the program was introduced, the plaintiff had attended an informational meeting on the new program, and she had signed an attendance sheet acknowledging that she had attended the meeting and that she had received a copy of the pamphlet outlining the new program. *Id.* at 971. Additional materials, reminding employees of the program and emphasizing that continued employment indicated assent to the terms of the program, were sent out by the company to its employees in the following years. *Id.* After she was terminated and after she filed an FMLA and discrimination lawsuit in federal court, the plaintiff argued that she had not consented to the terms of the program. *Id.* In light of the extensive record indicating that the plaintiff was well aware of the terms of the program, the Sixth Circuit concluded that the facts indicated a "knowing and voluntary" acceptance of the program's terms. *Id.* at 974.[6] Therefore, *Fisher* and

---

[6]In *Seawright*, the court indicated that any discussion involving assent in this context should consider whether the plaintiff waived his right to sue in federal court. *Id.* at 973 (citing *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir. 2003)). In determining whether a

10

Case 3:09-cv-00250   Document 18   Filed 05/22/09   Page 10 of 15 PageID #: 138

*Seawright* stand for the proposition that an employee can bind himself to submit his employment claim to his employer's alternative dispute resolution program if he continues to be employed after the institution of the program. But, in both of those cases, it was undisputed that the employee was aware of the existence of the program and had an opportunity to become familiar with all of the details of the program at issue.

Here, the evidence of assent is significantly more wanting. As noted above, the plaintiff has submitted an affidavit in which he contends that he never received any mailing or e-mail about the "We Listen" program, that he never heard the program being discussed at work, and that he never saw any signs discussing the program while he was at work. (Docket No. 9 Ex. 1 at 2.) Indeed, the plaintiff claims that the first time he saw the "We Listen" brochure at issue here was when he received the defendants' pending motion. (*Id.* at 3.)

Plainly, the plaintiff's affidavit is self-serving, and it should not entirely control the decision here. If other factors and evidence indicated that the plaintiff's position was not credible, the court would not afford these statements significant weight. *See e.g. Tinder v. Pinketon Security*, 305 F.3d 728, 732-35 (7th Cir. 2002) (not crediting the plaintiff's statements that she had not heard about her employer's alternative dispute resolution program until after she filed the lawsuit due to the uncontroverted facts that the program was in place for almost a year

---

plaintiff "knowingly and voluntarily" waived the right to sue, the court should consider (1) the plaintiff's experience, background and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the plaintiff had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver as well as (5) the totality of the circumstances. *Id.* The waiver discussion, therefore, to some extent, presumes that the plaintiff has, on some level, reviewed the relevant waiver. Here, the plaintiff's argument is largely that he never received the "We Listen" materials, and, therefore, an analysis under *Morrison* is less appropriate than it would be in cases in which the defendant had shown that the plaintiff had reviewed, to some degree, the waiver at issue.

11

before the plaintiff quit her job and that, during that time, the plaintiff received two notices of the program enclosed with her paycheck, along with other materials indicating that the program was in place).

That said, the credibility of the plaintiff's statements is bolstered by the facts discussed herein, particularly when those facts are viewed in the light most favorable to the plaintiff.  First, the plaintiff was terminated on January 26, 2009, which means that he was employed by TruGreen for less than three weeks after the "We Listen" brochure was allegedly mailed to all employees of ServiceMaster.  Therefore, the plaintiff was likely not to be exposed to the types of post-implementation meetings, mailings, and discussions that were relevant to the assent discussion in *Foster* and *Seawright.*  Second, even though the plaintiff was an employee during the "run up" period to the implementation and for a few weeks after implementation, the plaintiff missed a substantial amount of time during this period on FMLA leave caring for his severely ill wife.  The plaintiff's position that he never saw the mailing and does not recall discussion of the program (including, implicitly, any discussion that took place at the December 8 branch meeting) seems reasonable in light of the facts that the plaintiff was missing work and was otherwise distracted by his wife's illness.

Further, the defendants have come forth with little evidence that would tend to refute the plaintiff's statements and show that the plaintiff was exposed to the relevant materials.  During the time that the plaintiff was an employee, there was apparently no effort made by the defendants to have employees sign a form acknowledging their receipt and understanding of the "We Listen" program.   Rather, Ms. Weston, the Director of Communications for ServiceMaster, simply states that "ServiceMaster mailed a copy of its employee dispute resolution program ... to

12

the home address of all associates and managers of all ServiceMaster business units, including the home of plaintiff. ... The letter sent to Mr. Smith's home enclosing the Program was not returned." (Docket No. 8 Ex. 1 at 1-2..)  This is fairly weak evidence of delivery, let alone assent.  In her capacity as Director of Communications for all of ServiceMaster, Weston is obviously aware that there was a mass, company-wide mailing of the program brochure, but there is nothing in her affidavit that convinces the court that she would have any knowledge of the specifics of the delivery of the individual mailing that went out to the plaintiff.

Moreover, Mr. Crowley's affidavit, which discusses the December 8 branch meeting, is similarly wanting of evidence that the plaintiff received the details of the program.  Mr. Crowley simply states that, "on December 5, 2008, the Branch held an informational meeting, wherein the Branch employees were informed of the "We Listen" program."  (Docket No. 14.)  Obviously, this statement is exceedingly vague, with no discussion as to what details of the "We Listen" program were provided.  There is no indication, for instance, that employees were informed that, as a condition of their continued employment, they agreed to submit certain disputes to the alternative dispute resolution program.  Either way, Mr. Crowley provides no evidence that the plaintiff attended this meeting.  Indeed, the plaintiff points out that " the alleged meeting occurred during plaintiff's FMLA leave period, and therefore, [the plaintiff] was likely not in attendance since he has no knowledge of the program." (Docket No. 17 at 1-2.)  The affidavits submitted by the defendants simply do not provide the necessary support to establish that the plaintiff assented to the terms of the  "We Listen" program.[7]

---

[7] The defendants also argue that the "Mailbox Rule" is somehow relevant to the resolution of this case.  As the defendants point out, "under the common law mailbox rule, the proper and timely mailing of a document raises a rebuttable presumption that the document has

13

In sum, in stark contrast to both *Fisher* and *Seawright*, there is insufficient evidence that the plaintiff assented to the terms of the "We Listen" program; the defendants have failed to demonstrate, at this stage, that the plaintiff reviewed the "We Listen" program or that the plaintiff was familiar with the program in any way while he was employed. Without this evidence, the defendants cannot establish that the plaintiff manifested his assent to the terms of the program by continuing to work for the defendants. In sum, the plaintiff has easily raised a genuine issue of material fact as to whether an arbitration agreement was formed here, and, therefore, the defendants' motion will be denied.[8]

## **CONCLUSION**

For the reasons discussed herein, the defendants' Motion to Dismiss or, Alternatively, to

---

been received by the addressee in the usual time." (Docket No. 13 at 2 citing *Aetna Life Ins. Co. v. Montgomery*, 286 F. Supp. 2d 832, 839 (E.D. Mich 2003)). There are at least two major problems with the defendants' mailbox rule argument. First, as indicated by the quote above, the mailbox rule is concerned with whether materials were delivered to a location within a given time frame, not whether an understanding of the materials delivered was gained. Second, to the extent basic mailing and delivery were relevant, as noted above, the defendant's evidence of mailing and delivery is fairly weak, resting solely on the say-so of ServiceMaster's Director of Communications.

[8] In briefing. the parties dispute numerous additional issues including (1) whether, assuming assent, there was sufficient consideration and mutuality of obligation, (2) whether, assuming notice of the program, the plaintiff would have had sufficient time in between when he would have heard of the program details and when he was terminated such that his continued employment would constitute a waiver of his right to sue here; and (3) whether any contract formed is illusory. As the defendants have failed to meet their burden to show assent to the terms of the purported contract, the defendants have not shown a contract was formed, and, therefore, it is not necessary to consider these additional issues. The court recognizes that the defendants have devised this program, presumably at considerable expense, as a way to resolve increasingly costly and time consuming disputes in more efficient and productive manner. The court is denying the defendants' motion based on the unique factual circumstances here, and, through this opinion, the court does not intend to offer any opinion about the general viability of the "We Listen" program.

14

Stay Action and Compel Arbitration will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge